IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

HAROLD SCOTT,

                              Plaintiff,

v.                                                            **COMPLAINT**

TIMOTHY DOWNS, KYLE PAYTON, MATTHEW BELLINGER,
CARTWRIGHT, BENJAMIN, and CURTIS SCOTT, Drill Instructors,
KATHY MELLINI, R.N., and CRAIG WYCKOFF, Correction Sergeant,
in their individual capacities,

                              Defendants.

---

Plaintiff HAROLD SCOTT, by his attorneys, Prisoners' Legal Services of New York, Megan Welch and David Bentivegna, of counsel, hereby brings this action under 42 U.S.C. § 1983 to redress his civil and legal rights, and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a Civil Rights action brought by a former state prisoner, currently residing in Rochester, New York, pursuant to 42 U.S.C. § 1983. Plaintiff seeks relief for the injuries inflicted on him during a wanton, malicious, unprovoked, and unjustified assault, and the denial of medical care to address such injuries, by Defendants on June 12, 2019, at the Willard Drug Treatment Campus. Defendants' actions violated Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff seeks declaratory relief, compensatory and punitive damages, an award of costs, attorney's fees, and such other and further relief as this Court deems just and proper.

## JURISDICTION AND VENUE

2. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

3. Venue in this District is proper under 28 U.S.C. § 1391(b) and (c), as the events giving rise to this claim occurred in Willard, New York, Seneca County, and within the boundaries of the Western District of New York.

## PARTIES

4. Plaintiff HAROLD SCOTT is a citizen of the United States, currently residing in Rochester, New York. At all relevant times of the events described herein, Plaintiff was confined at the Willard Drug Treatment Campus ("Willard") in Willard, New York.

5. Defendant TIMOTHY DOWNS was, at the time of the events mentioned herein, a Drill Instructor at Willard.

6. Defendant KYLE PAYTON was, at the time of the events mentioned herein, a Drill Instructor at Willard.

7. Defendant MATTHEW BELLINGER was, at the time of the events mentioned herein, a Drill Instructor at Willard.

8. Defendant (first name unknown) CARTWRIGHT was, at the time of the events mentioned herein, a Drill Instructor at Willard.

9. Defendant (first name unknown) BENJAMIN was, at the time of the events mentioned herein, a Drill Instructor at Willard.

10. Defendant CURTIS SCOTT was, at the time of the events mentioned herein, a Drill Instructor at Willard.

11. Defendant KATHY MELLINI was, at the time of the events mentioned herein, a nurse at Willard.

12. Defendant CRAIG WYCKOFF was, at the time of the events mentioned herein, a Sergeant at Willard.

13. On information and belief, at all times relevant to the events described herein, Defendants were employed by and acting under the color of law of the State of New York.

## STATEMENT OF FACTS

14. On June 12, 2019, Plaintiff was a parolee held in the custody of the Department of Corrections and Community Supervision ("DOCCS") at Willard.

15. At approximately 7:00 A.M., while Plaintiff was exercising in the recreation yard at Willard, he began to feel dizzy and then fainted. He was escorted to the infirmary for an emergency sick call to address his medical condition.

16. Upon information and belief, Defendant DOWNS, Defendant PAYTON, and an unnamed parolee were in the infirmary waiting room when Plaintiff arrived.

17. While waiting to be seen by medical staff, Defendant DOWNS informed Plaintiff that his hair was not tied back in compliance with DOCCS' protocol and thus had to be adjusted.

18. In response, Plaintiff told Defendant DOWNS his dreadlocks were tied back in accordance with the rule book he was given when he arrived at Willard.

19. Plaintiff and Defendant DOWNS then engaged in a verbal dispute on the proper way for Plaintiff to tie back his hair. During this time Defendant DOWNS became increasingly hostile towards Plaintiff.

20. In the midst of this verbal dispute, Defendant Downs, without provocation or justification, struck Plaintiff across his face.

21. Plaintiff responded by striking Defendant DOWNS in his face.

22. Defendants DOWNS and PAYTON then forcibly took Plaintiff to the floor and placed his hands in mechanical restraints behind his back. Once restrained, Plaintiff ceased any resistance and Defendant DOWNS removed the unidentified (and otherwise uninvolved) parolee out of the waiting room.

23. Upon information and belief, Defendants BELLINGER, CARTWRIGHT, BENJAMIN, and SCOTT then entered the infirmary waiting room, and along with Defendants DOWNS and PAYTON, all began punching, kicking, kneeing and striking Plaintiff about his head, face, and body.

24. Throughout this assault, Plaintiff remained on the floor with his hands in restraints, crying out in pain and for help.

25. The six above-mentioned Defendants carried out their assault upon Plaintiff in bad faith, sadistically and maliciously for the very purpose of causing him harm. The blows and assault upon Plaintiff by these defendants were neither justified, nor necessary to either maintain or restore order or discipline.

26. After they ceased their assault, Defendant DOWNS and PAYTON lifted Plaintiff to his feet and removed him from the infirmary waiting room. They placed him in a locked infirmary side room by himself, keeping his hands behind his back and in restraints.

27. At that time and as a result of the assault he had just endured, Plaintiff experienced difficulty breathing, his face became significantly swollen and he was in such severe pain it was difficult for him to stand.

28. While he remained in the infirmary side room, Plaintiff called for help repeatedly and requested that he be provided assistance from medical staff.

29. At approximately 7:30 A.M., Defendant WYCKOFF entered the infirmary side room and interfered with Plaintiff's ability to obtain and receive medical care and attention for his injuries, by demanding that Plaintiff sign a medical care refusal form. He threatened Plaintiff with further physical abuse if he refused to sign the form, in an effort to cover up the assault by preventing documentation of Plaintiff's injuries and by keeping him from receiving necessary medical care for those life-threatening injuries.

30. Under extreme duress and out of fear that he would be further harmed and assaulted, Plaintiff signed the medical refusal form.

31. At or about this time, Defendant Nurse MELLINI was aware of the use of force incident involving Plaintiff. However, she never examined, assisted, or provided any care to Plaintiff, and never advised him of the consequences of refusing medical care, in violation of DOCCS' Division of Health Services Policy Number 7.18.

32. Additionally, Defendant MELLINI purposefully failed to conduct any examination of Plaintiff's obviously apparent and severe injuries, in further violation of DOCCS' Directive Number 4944.

33. Upon information and belief Defendant MELLINI's actions in not examining Plaintiff, or otherwise assisting or providing him care, were in further effort to aid in covering up the malicious assault.

34.     Plaintiff was thereafter escorted to and confined in the Special Housing Unit ("SHU"), and subsequently issued a Misbehavior Report charging him with the following rule violations of the Standards of Inmate Behavior: 104.11 (Violent Conduct), 104.13 (Disturbance), 100.11 (Assault on Staff), and 106.11 (Direct Order).

35.     That same day, Defendant WYCKOFF also prepared a Use of Force Report in which he falsely documented what occurred during the incident.

36.     Plaintiff was subsequently removed from the Willard Drug Treatment Campus later that morning, and transferred to Elmira Correctional Facility ("Elmira") approximately 43 miles away.

37.     Upon his arrival at Elmira, Plaintiff was seen and evaluated by Elmira medical staff who immediately had him transported to Arnot Ogden Medical Center by ambulance due to the seriousness of his injuries.

38.     At Arnot Ogden Medical Center, Plaintiff was diagnosed with four broken ribs, a collapsed right lung, and severe bruising/swelling to his face and right-side body, all as a result of Defendants assault upon him. Emergency surgery was performed to drain and re-inflate Plaintiff's punctured and collapsed lung, and he spent three days in the Intensive Care Unit.

39.     Plaintiff was discharged from Arnot Ogden Medical Center on June 15, 2019, and returned to Elmira, where he was then admitted to the facility medical infirmary. He remained under care in the infirmary an additional eleven days, until June 26, 2019, when he was discharged to and confined in the SHU.

40.     Throughout this time and for a significant and prolonged period, Plaintiff suffered from severe pain in his chest, face, and the right-side of his body. Plaintiff also experienced substantial mental and emotional distress during and following the assault.

41. On July 8, 2019 a Tier III Disciplinary Hearing was commenced, based on the Misbehavior Report Plaintiff received following the June 12, 2019 assault.

42. Although this hearing was being held at Elmira, Superintendent Bartlett, the Superintendent of the Willard Drug Treatment Campus, ordered his Deputy Superintendent of Programs, DSP Titus, to travel from Willard to Elmira to act as the disciplinary hearing officer and thereby officiate the proceeding. DSP Titus had been informed of the use of force on the day of the incident.

43. At the start of his hearing, Plaintiff requested Defendant DOWNS as a witness.

44. Even though Defendant DOWNS had authored the Misbehavior Report and was present during the entire June 12, 2019 assault incident, DSP Titus denied Plaintiff's request, concluding erroneously that Defendant DOWNS was not a relevant witness.

45. Plaintiff thereafter accused DSP Titus of being biased against him and asked to be removed from the hearing. DSP Titus had him removed.

46. DSP Titus called no other witnesses and, on the same day she began the hearing, July 8, 2019, found Plaintiff guilty of all charges, and imposed 90-day SHU sanction.

47. Superintendent Bartlett reviewed this disciplinary hearing on July 9, 2019, and found it to be "conforming to policy and regulations."

48. On September 3, 2019, Director Venettozzi, of the DOCCS Office of Special Housing, reversed the July 8, 2019 disciplinary hearing determination, due to the improper denial of Defendant DOWNS as a witness and ordered a rehearing.

49. A rehearing was never conducted and Plaintiff remained in SHU for the entire 90-day sanction.

50. In addition to his SHU sanction, Plaintiff also served more time in prison as a result of the assault and his subsequent removal from the Willard Program. Plaintiff was originally transferred to DOCCS custody on May 25, 2019, to serve a 12-month parole violation, with an agreement that he could alternatively be restored to supervision if he completed the 90-day Willard Drug Program. Plaintiff would thus have had the opportunity to be immediately released from prison after completing this 90-day program, and was only expected to serve the entire 12 months if he was unsuccessful.

51. Had Plaintiff remained in the Willard Program he would have graduated and been released from prison on or about August 25, 2019. Due to the malicious assault and his improper, unjustified removal from Willard, Plaintiff remained in prison for an additional six-and-one-half months, and was finally released on March 17, 2020.

52. Staff disciplinary proceedings were initiated against all defendants as a result of the June 12, 2019 assault upon Plaintiff. Upon information and belief defendants were suspended during those proceedings, and discipline was imposed.

53. Plaintiff exhausted his available administrative remedies on August 16, 2019, after he filed a grievance related to the assault on June 24, 2019, and appealed it to the Central Office Review Committee on July 16, 2019.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
(Excessive Force)

54. By their actions as described herein, of maliciously and sadistically assaulting Plaintiff, Defendants DOWNS, PAYTON, BELLINGER, CARTWRIGHT, BENJAMIN, and SCOTT violated Plaintiff's Eighth and Fourteenth Amendment rights.

## SECOND CLAIM FOR RELIEF
**(Deliberate Indifference to Serious Medical Needs)**

55. By their actions as described herein, in denying and failing to provide necessary and appropriate medical care and treatment, or otherwise interfering with the provision of such care, for Plaintiff's serious and life-threatening injuries, Defendants MELLINI and WYCKOFF violated Plaintiff's Eighth and Fourteenth Amendment rights.

**WHEREFORE**, Plaintiff requests that this Court:

1. declare that the acts alleged herein are in violation of Plaintiff's rights under the Constitution and laws of the United States;

2. enter judgment in favor of Plaintiff for reasonable actual and compensatory, including consequential, damages against Defendants DOWNS, PAYTON, BELLINGER, CARTWRIGHT, BENJAMIN, SCOTT, MELLINI, and WYCKOFF, jointly and severally, to compensate Plaintiff for his pain, suffering, and other hardships arising from the assault upon him;

3. enter judgment for Plaintiff for reasonable punitive damages against each of the defendants;

4. award Plaintiff the costs of this action, including reasonable attorney's fees; and

5. grant such other and further relief as the Court deems just and proper.

Dated: December 30, 2021
     Ithaca, New York

                                                                /s/Megan Welch
                                                                MEGAN WELCH, Esq.
                                                                Prisoners' Legal Services of New York
                                                                Attorney for Plaintiff
                                                                114 Prospect Street
                                                                Ithaca, NY 14850-5616

        Tel. (607) 273-2283
        mwelch@plsny.org

        ___/s/David Bentivegna_____
        DAVID BENTIVEGNA, Esq.
        Prisoners' Legal Services of New York
        Attorney for Plaintiff
        14 Lafayette Square, Suite 510
        Buffalo, NY 14203
        Tel. (716) 854-1007
        dbentivegna@plsny.org